393 F.2d 673
 The NEWS UNION OF BALTIMORE, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Hearst Corp., News American Division, Intervenor.
TRUCK DRIVERS AND HELPERS, LOCAL 355, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Hearst Corp., News American Division, Intervenor.
 No. 20743.
 No. 20787.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 12, 1967.
 Decided February 9, 1968.
 
 Mr. Jacob B. Davis, Baltimore, Md., with whom Mr. George Cochran Doub, Baltimore, Md., was on the brief, for petitioner in No. 20,743.
 Mr. Bernard W. Rubenstein, Baltimore, Md., with whom Mr. Jacob J. Edelman, Baltimore, Md., was on the brief, for petitioner in No. 20,787.
 Mr. Solomon I. Hirsh, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.
 Mr. John B. Siefken, New York City, for intervenor.
 Before BAZELON, Chief Judge, and McGOWAN, and TAMM, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated cases involve petitions by two labor unions ("News Union" and "Teamsters") to set aside an order of the National Labor Relations Board dismissing a complaint that the intervenor-newspaper ("Hearst") had violated Sections 8(a) (1) and (3) of the National Labor Relations Act. 29 U.S.C. § 151 et seq. The issue presented is whether a lock-out of all its employees by Hearst, including those represented by News Union and Teamsters, constituted the interference with Section 7 rights and the discrimination in derogation of union membership forbidden by the statute. The matter was explored in a full evidentiary hearing before an examiner, and the Board adopted his findings of fact and recommendation of dismissal. We do not interfere with this disposition by the Board.
 
 
 2
 * Baltimore has two major newspaper companies — Hearst, which publishes the News American, and Abell, which publishes the Sunpapers. The two have functioned for many years as a multi-employer bargaining unit vis-a-vis several of the unions representing certain of their employees, and jointly bargained contracts with such unions were in effect at the time of the events here in question. Teamsters had such a contract, but News Union did not.
 
 
 3
 News Union represents editorial and other white-collar employees. Early in 1965 a rival union, the Washington Newspaper Guild, was certified as the bargaining agent of such employees on the Sunpapers. The Guild was unable to reach agreement on a contract, and on April 17, 1965, the Guild struck the Sunpapers at noon and set up a picket line. The Sunpapers, which had never missed publication in their history, made an effort to continue this tradition unbroken, aided by the fact that about one-third of the Guild members kept on working. Trouble came, however, from the Teamsters and the printers, these latter being members of Local 12 of the International Typographical Union ("ITU") with whom Hearst and Abell had a joint contract. After the first day of the strike, the Teamster employees to a man honored the picket line. The printers reported for work in part for two days, but on the third none appeared. All other Sun employees ignored the picket line; and thus it was that, in respect of a strike which began at noon on Saturday, Abell managed to get its papers out on Sunday and Monday but suspended on Tuesday.
 
 
 4
 Hearst and Abell had agreed long before that, if employees under a joint contract struck one paper contrary to that contract and caused a suspension, the other paper would cease publishing also. Accordingly, upon being notified by Abell that the condition of this understanding had happened, Hearst terminated publishing and instructed all of its employees, except those who could be used in maintenance work, to stop coming to work until further notice.[1] Approximately one month later, when all the printers returned to work at the Sun, Abell resumed publication, as did Hearst on the same day, recalling all its former employees who wished to return.
 
 II
 
 5
 In its suspension notice to its employees, Hearst characterized the refusal of the printers and Teamsters to cross the picket lines as a violation of their joint contracts justifying the lock-out.[2] Thus we assume for present purposes, as have the parties before us, that the propriety of the lock-out must rest in the first instance on whether the contracts can be interpreted as covering a refusal to cross picket lines. Petitioners contend here, as they did before the Board, that no such interpretation can reasonably be made. We address ourselves to that issue principally by reference to the ITU contract since it was also argued to us that the defection of the Teamsters was not a contributing cause of the Sun's suspension. Although we do not necessarily accept this to have been the case,[3] it is clear that, if the printers' contract is as broad as the Board finds it to be, the result here is the same whether the Teamsters' is or not.
 
 
 6
 The relevant language of the ITU contract is as follows:
 
 
 7
 The language and spirit of this Agreement guarantee the prompt and faithful performance by the Union and the Office of all obligations imposed by the terms of this Agreement. Both parties agree that whenever any differences of opinion as to the rights of either under the Agreement shall arise, or whenever any dispute as to the construction of the contract or any of its provisions takes place, such difference or dispute shall be promptly resolved in the manner provided in this contract without strike, lockout, diminution, or interruption of any kind, to the end that fruitless controversies shall be avoided, good feeling and harmonious relations be maintained, and the prosecution of the business in which the parties have a community of interest shall be assured.
 
 
 8
 Elsewhere in the contract the grievance procedure set up is characterized as to be invoked with reference to "differences in the interpretation and enforcement of the terms of this contract, including the question of whether * * the disputed issue is covered by the terms of the agreement, and including the interpretation of all language contained in this contract."[4] Petitioners point out that there is no explicit reference to the crossing of picket lines and suggest initially that language which in terms inhibits only a strike is not to be read as restricting the observance of picket lines. But the practical relationship between work stoppages and the honoring of picket lines is so well understood in the industrial climate that we think that a clause of this kind using only the word "strike" includes plant suspensions resulting from refusals to report for work across picket lines. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953).[5]
 
 
 9
 A more serious issue is tendered by the contention that the failure to cross picket lines here is not related in any way to the terms of the contract and that, accordingly, it does not involve "any differences of opinion as to the rights of either [party] under the Agreement," nor "any dispute as to the construction of the contract." The Trial Examiner was fully cognizant of the force of this point, and of the principle that statutorily protected rights to strike and to observe picket lines are not to be regarded as waived in the absence of a visible purpose to do so. See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 283-284, 76 S.Ct. 349, 100 L.Ed. 309 (1956); Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 750-751, 2 L.R.A.3d 868 (6th Cir. 1963); Tide Water Associated Oil Company, 85 N.L.R.B. 1096, 1098 (1949). He expressed doubt that the contract terms themselves exhibited the "clear and unmistakable" language of waiver, because he thought the picket line issue would not normally be regarded as comprehended within the contract's characterization of the kinds of questions over which no strike or lock-out would occur.
 
 
 10
 In any event, the ambiguities with respect to the precise scope of the clause apprehended by the Examiner caused him to summon to his aid other evidence in the record which might shed light on this question of intention. He purported to find it in the attitudes and opinions expressed by the union leadership.[6] When Abell learned that the Guild would strike on April 17 and put up picket lines, its business manager asked the other unions what they would do in such event. The president of the printers' local told him that the no-strike clause would be honored and the men would continue working.[7] Two days before the strike started, the Sun's printers had a meeting at which the local's president and secretary-treasurer advised the men that "they had a contract and should continue working," and that this was the opinion of the president of the ITU. At a second meeting two days after the strike began, similar representations were made by the two officers of the local, and were supplemented by messages from the ITU that the men should remain at work and that, if they did not, the ITU would not provide strike benefits for them.[8] A vice-president of the local and the chairman of the Sun printers said, however, that they would not cross the Guild picket lines as a matter of principle. After both papers had suspended, the local issued emergency travel cards which enabled the recipient members to work in other cities. When the ITU heard of this, it ordered the local to recall all such cards issued to Sun printers.
 
 
 11
 Petitioners urge that this evidence dehors the contract should not be considered since the contract language is clear in its failure to bar observance of the picket lines. In our view, however, the Board was not required to regard the contract language as free from doubt on its face and that, in the search for intention, it was entitled to seek illumination in these external circumstances. And those circumstances were significant. The union tradition of honoring picket lines is admittedly strong, but, just as its waiver in formal contract language is not to be precipitately assumed, so it is unlikely that responsible, experienced, and authoritative union leaders will lightly interpret their own handiwork as barring its observance. The deference due from us to the Board's expertise extends to the interpretation of collective bargaining agreements — questions in which the Board's energies are constantly engaged. We do not, on this record, think that the answer it reached is so dubious as to warrant our imposing a different one.[9]
 
 III
 
 12
 The printers are not, of course, before us complaining of the Board's action, but News Union and Teamsters argue that, even if the contracts be interpreted as limiting the freedom of printers and teamsters to cross the Guild picket lines, Hearst could not validly suspend its operations. The argument essentially is that Hearst employees have a right to belong to a union, and that that right is wrongfully interfered with when their work is lost because either another union or some other members of their own union fall short in their observance of contract commitments to another employer.
 
 
 13
 The contracts in question, however, were contracts to which Hearst was a party by reason of the multi-employer bargaining unit. Such units are legal, and indeed depend upon the consent of the unions with whom multi-employer joint contracts are bargained. A non-struck member of such a unit may lock out his employees in defense of the unit's common interests. NLRB v. Truck Local (Buffalo Linen Supply Co.), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). One of those interests is surely the maintenance of the integrity of commonly-bargained no-strike clauses; and this the Board has found to be the sole motivation of Hearst's suspension of publication. Where such a suspension occurs, it is true that innocent employees, union and non-union alike, lose their work. But this is the inevitable consequence of the fact that a newspaper cannot suspend publication on a partial or selective basis so as to provide continuing work for employees unimplicated in any way with the offending conduct of employees of other newspapers. New York Mailers' Union v. NLRB, 327 F.2d 292 (2d Cir. 1964).
 
 
 14
 It is clear from the Board's decision that it relied directly upon this Second Circuit ruling in New York Mailers'. We think that reliance was not misplaced. Involving a multi-employer unit of newspapers, the case upheld a Board order refusing to find an 8(a) (1) and (3) violation where non-struck employers closed down when one member of their unit was struck contrary to the no-strike clause. It is urged upon us that that case is inapplicable because there was a pattern of wildcat strikes which justified the employers' eventual response in self-defense. But we do not consider that an employer must be shown to be a patient and long-suffering victim of contract violations before it can act to protect the integrity of its jointly bargained agreements.
 
 
 15
 The Trial Examiner was characterized by the Board as having "found" that "the unions were responsible for the conduct of their members and therefore themselves breached their agreements," but the Board did not think it necessary for it to resolve the issue of union responsibility in these terms, presumably for reasons akin to those expressed by us above in fn. 2. Petitioner News-Union argues, however, that, absent such a finding, there is a fatal gap in the link between the Sun suspension and that of Hearst, converting the latter into an unjustifiable lock-out by one employer simply to aid another. This seems to us to misconceive the nature of the individual employer interests in the multi-employer bargaining unit.
 
 
 16
 There is no question but that Abell was privileged to suspend publication because, whether the unions as entities were answerable in damages for their members' conduct, that conduct was in conflict with the no-strike clause in the contract, and the bargaining expectations entertained by the employer-parties to that contract were correspondingly defeated. Hearst's interests, as a party to that contract equally with Abell, was in protecting the integrity of those expectations; and the means of protection devised was that, if picket line observance achieved such proportions as to make one paper shut down, the other would suspend also. The question here is whether Hearst's resort to those means was an unfair labor practice directed against organizing rights and union membership as such.
 
 
 17
 The Board could, we think, conclude that it was not, without determining whether the unions were responsible in the sense of contract liability. What the Trial Examiner appears to have "found" here was that the picket line observances were not restricted to a few union members, but, rather, embraced the entire membership of each local; and it was in this sense that he "found" union responsibility. It is not urged before us that there is any dispute of fact between the parties on this matter of the extent of union member participation in the Sun stoppage. The Board has found those facts in the same way as the Trial Examiner. What it has not done is to be drawn into characterizations of these facts in terms of union responsibility which might be relevant in a contract action or a contempt citation but are not necessary to the result here. The Board decision upheld in New York Mailers' expressly rejected any need to find that the unions were legally responsible in a contract sense. After reviewing the evidence of encouragement or discouragement by the union officers of the contractually-forbidden work stoppages, the Board said in that case:
 
 
 18
 * * * Thus, though it is questionable whether the individual unions could be held `responsible' for the stoppages in a court of law, neither are we willing to insulate all employees, or members of the crafts, from a form of defensive action which reasonably seemed necessary to halt the stoppages.
 
 
 19
 The dissent appears always to use the word "union" in the sense of the officers of the union; and it would presumably remand the case to the Board with directions to address itself to the Examiner's finding of union responsibility in the light of the evidence that some effort was made by some union officers to prevent the work stoppage. We think such a remand unnecessary where there is no dispute as to the massive nature of the members' forbidden observance of the picket line. A finding of heroic and untiring efforts on the part of the officers to persuade the members to continue working might conceivably save the union treasury from damage claims, but it would not, under the circumstances here involved, enable the unions now to make of Hearst's response to the Sun shutdown an unfair labor practice. For this latter purpose, "union action" is reasonably to be equated with the action of all of the union members, even though that action be taken in defiance of the officers.[10] Absent this consequence, it is hard to see what a multi-employer unit would get from what it may have given to obtain a no-strike clause, or how such a clause could be other than wholly illusory.
 
 
 20
 Hearst is charged with the unfair labor practices of interfering with union membership and of discouraging it by discriminatory acts against union members. But this record is devoid of any evidence that Hearst was animated by any anti-union bias. It closed its plant in order to carry out its commitment to the other member of the multi-employer unit. Its interest in doing so was to establish the sanctity of undertakings in jointly bargained contracts to which it was a party. That interest is a substantial one which, if not protected against this challenge, was in danger of dissipation.
 
 
 21
 There is no suggestion that, even in the selection of the employees kept on the job for maintenance purposes, Hearst discriminated in any way against union members. When publication was resumed, it recalled to work all of its former employees, union and non-union. We cannot find in all this, no more than did the Board, that the unfair labor practices charged were proved. The petitions for review are, accordingly, denied.
 
 
 22
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 The notice given by Hearst to its employees, after referring to the joint contracts with the Teamsters and the printers and to the refusal ofSun employees covered by those contracts to cross the Guild picket lines, went on as follows:
 The News American deems such refusal a violation of the joint contracts with the Unions above named, and is a threat to the interest of the Sun and News American in bargaining on a group basis.
 Under the circumstances, you are hereby notified that the News American is suspending publication temporarily.
 You are directed not to report for work until further notice after the completion of your present shift.
 Your compensation ceases as of the last shift worked.
 Your employment with this newspaper has not been terminated. The purpose of this notice is to advise you of a period during which there will be no work to be performed by those employees who are not specifically requested to work.
 We regret the result of the Union's [sic] actions. However, we hope that this unfortunate strike situation will be terminated in the very near future.
 
 
 [2]
 We have endeavored throughout to avoid shorthand references to contract violations, or breaches of contract, by the unions. These might be misleading in other contexts than the one before us, which relates solely to whether Hearst committed an unfair labor practice in suspending publication. That issue is to be decided by reference to whether Hearst's response to theSun's shutdown amounted, under the circumstances, to an interference with organizational rights and a discrimination against union membership. Its resolution in favor of Hearst concludes nothing with respect to whether Hearst or Abell could successfully seek damages or other relief from the unions for breach of contract.
 
 
 [3]
 This lack of connection between the Teamsters' absence from work and theSun's shutdown is said to follow from the fact that Abell published for two days without Teamster help, and resumed publishing after the printers returned to work, although the Teamsters continued to honor the Guild picket line for the remaining week of its life. But the record is not such as to enable us to say with complete assurance that the problems of distribution attendant upon the Teamsters' stoppage of work were in no way an element in the management decision made by Abell to suspend.
 
 
 [4]
 The relevant language of the Teamster contract is as follows:
 Continuous and uninterrupted delivery by the Companies of their newspapers and orderly collective bargaining relations between the Companies and the Union to secure prompt and fair disposition of grievances being an essential consideration for this Agreement, it is agreed that the Union and its members individually and collectively will not, during the term of this Agreement, cause, permit, or take part in any strike, sit down, picketing or other curtailment or restricting of the delivery of the Companies' newspapers until the procedure hereinafter provided for the settlement of grievances has been exhausted. * * *
 Elsewhere the grievance procedure is described as covering "any complaint or grievance" that might arise.
 There was evidence in the record to the effect that, when this contract was being negotiated, the Teamsters proposed that there be exempted from this clause a refusal to cross a picket line at the primary employer's premises. The employers turned this down, and it was not pressed further.
 
 
 [5]
 The contractual undertaking inRockaway was that there would be "no strikes, lockouts or other cessation of work or interference therewith * * * except as against a party failing to comply with a decision, award or order" of an Adjustment Board set up under the contract to handle complaints about foremen, employee discharges, and other employee deprivations. This would appear to be a narrower no-strike clause than is involved here, but the Supreme Court, relying upon the contract, sustained the Board's ruling that it was not an unfair labor practice for the employer to dismiss an employee who refused to cross a picket line.
 
 
 [6]
 The Examiner took into account for this purpose the evidence that the Teamsters in negotiating its contract with the multi-employer unit had proposed that its no-strike clause specifically exempt a refusal to cross picket lines at the employer's primary place of business. See Note 4,supra. In Rockaway, at pp. 79-80 of 345 U.S., at p. 524 of 73 S.Ct., the Supreme Court took note of the making of an offer of proof to the same effect as relevant if ambiguity be thought to exist. See also Communications Workers of Am. v. Pacific N.W. Bell Tel. Co., 337 F.2d 455, 459 (9th Cir. 1964).
 
 
 [7]
 The response from the president of the Teamsters local, who negotiated its joint contract, was that, in his opinion, a refusal to cross the Guild lines would "dishonor" the contract, and that he would recommend to his members that they continue working. A vice-president of the local made a similar statement the day before the strike, and urged the men to stay on the job
 
 
 [8]
 The president of ITU sent a telegram to the local which said in part:
 It is the obligation of each member to fulfill contract requirements. Failure of members to perform work in accordance with the contract cannot be regarded as a lockout under any circumstances. * * * It is imperative that every individual member of Baltimore Typographical Union do his part to protect the Union's jurisdiction by performing normal work as required by contract and ITU laws.
 
 
 [9]
 At the oral argument petitioners called our attention to a recent Board decision, Hoffman Beverage Company, 163 N.L. R.B. No. 134, 65 LMRR 1011 (1967) finding that an arbitration clause did not relate to a dispute concerning the crossing of picket lines. We note that the contract language is not the same as that involved here, and that there was no evidence that the union leadership construed their contract as barring the failure to report for work
 
 
 [10]
 In Portland Web Pressmen's Union v. Oregonian Pub. Co., 188 F.Supp. 859 (D. Oregon), aff'd, 286 F.2d 4 (9th Cir.), cert. denied, 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237 (1960), a union brought suit to compel the submission of a controversy to arbitration as provided in the collective bargaining agreement. One defense was that the refusal to cross picket lines by every member of the union in breach of a no-strike clause deprived the union of the right to invoke the arbitration provision of the contract. The district court dismissed the complaint on this ground, among others, saying on this issue (which the Court of Appeals did not find it necessary to reach):
 * * * Without question, the plaintiff understood that neither the plaintiff nor its members had the right to stop work. The complaint alleges that the plaintiff unequivocally advised its members of its and their obligation not to strike and not to engage in work stoppages, while the contract between the parties remained in effect. The complaint also shows that notwithstanding the advice of the plaintiff, every member of the plaintiff declined to cross the picket lines maintained by the other union and refused to report for or perform their work in production of defendants' newspapers behind the picket line from November 10, 1959, until the expiration of the contract. * * *
 * * * * *
 The failure of an employee to cross a picket line to perform his job violates the no strike provision of an agreement. N. L. R. B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832. The union must be held responsible for the mass action of its members. United States v. International Union, D.C.Md.1948, 77 F.Supp. 563, affirmed 85 U.S.App.D.C. 149, 177 F.2d 29, certiorari denied 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535; United States v. Brotherhood of Railroad Trainmen, etc., D.C.N.D.Ill.1951, 96 F.Supp. 428. * * *
 
 
 
 23
 BAZELON, Chief Judge (dissenting).
 
 
 24
 I believe that under applicable case law a defensive lockout requires a finding that the union in some manner "threatens the destruction of the employers' interest in bargaining on a group basis."[1] Union tactics of whipsawing[2] and selective grievance strikes[3] have been recognized as justifying a lockout since they are designed to affect the union's relationship with the unit employers. Here the Trial Examiner found that because of the almost unanimous refusal of the employees to cross the picket line, the action may be attributed to the union itself as its tactic.[4] But the Board "deem[ed] it unnecessary to decide whether, as found by the Trial Examiner, the unions are responsible for the conduct of their members and therefore themselves breached their agreements." I do not agree that the Board needs only to find the employees' actions unprotected. I think the Trial Examiner's finding of union support is essential at least for a determination that the employers' interest in group bargaining with the union was threatened.
 
 
 25
 The majority says that a lockout is justified because to the extent that the employees' conduct conflicts with the no strike clause it defeats the employer parties' bargaining expectations: in other words since almost unanimous employee activity caused the work stoppage, the Board was not required to determine whether the union condemned or condoned the employees' action. This view ignores the union's role as the nexus which allows Hearst to lock out all its employees when printers and teamsters, whose unions bargained with the publishers' unit, honor the Guild's picket line at Abell. It is the union which agreed to act in good faith, and not engage in whipsawing or selective grievance strikes. Conceivably individual members may engage in unprotected activities which subject them to dismissal for violating the contract but which cannot be imputed to the union.[5] Only if the union authorizes or ratifies a work stoppage can the employers' interest be said to be threatened.[6] And whether this threat is sufficiently great to justify a lockout depends on the Board's "balancing of the conflicting legitimate interests,"[7] for not all union activity would justify a lockout.[8]
 
 
 
 Notes:
 
 
 [1]
 NLRB v. Truck Local (Buffalo Linen Supply Co.), 353 U.S. 87, 93, 77 S.Ct. 643, 646, 1 L.Ed.2d 676 (1957)
 
 
 [2]
 InBuffalo Linen the Supreme Court held that whipsawing was a union strike tactic designed to put selective pressure on members of the multi-employer unit.
 
 
 [3]
 In New York Mailers' Union v. NLRB, 327 F.2d 292 (2d Cir. 1964) the employees' activity was repeatedly characterized as a strike tactic and at footnote 9, the court noted that:
 We agree with the Board's resolution of the issue of the responsibility of the various unions for the conduct of their worker members in resorting to breach of contract strikes during disputes over grievances. The Board noted that the stoppages did not appear to be purely "wildcat" in nature; that such strikes were used against the publishers with "annoying frequency"; that several incidents involved a union steward or shop chairman; and that union officials were in every instance able to get their striking members to return to work.
 
 
 [4]
 The Trial Examiner found:
 To hold, as the representatives of the union urge, that every single one of these workmen, all members of disciplined labor organizations, acted independently of the opinion and belief of all others who moved with them would ignore the realities of industrial life and traditional union activities. * * *
 True, there is no direct evidence of inducement by either union as such, but union responsibility in this type of situation need not rest upon out and out confession.
 
 
 [5]
 In a wildcat strike where more than individual behavior is involved employees may be discharged for unprotected activity, but the union remains as bargaining agent for the unit. And Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 (1964 ed.) specifically provides that before responsibility for illegal employee activity can be attributed to the union, it must be shown that the union authorized or ratified the activity
 
 
 [6]
 The majority contends that a finding of union responsibility would only be required in this case to determine whether the union was liable for damages for breaking the contract. It reads the Board's action as justifying the lockout without finding the union liable under the contract, whereas inNew York Mailers the majority reads the Board's findings and the court's holding as indicating union liability under the contract. My view is that the Board is charged in the first instance with determining whether the lockout is justified and not with creating a record for the employer to rely on in a subsequent damage suit. Since both New York Mailers and this case involved careful consideration at different stages of whether the employer could lockout, I regard any discussion of "union responsibility" to bear primarily on the lockout question. The failure of the Board to find union responsibility here was a misreading of New York Mailers and Buffalo Linen.
 
 
 [7]
 NLRB v. Truck Local (Buffalo Linen Supply Co.), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957)
 
 
 [8]
 See American Ship Building v. NLRB, 380 U.S. 300, 327, 85 S.Ct. 955, 13 L.Ed. 2d 853 (1965) (concurring opinion) (Goldberg, J.).