**KELLOGG COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 71–1367.

United States Court of Appeals,
Sixth Circuit.

March 22, 1972.

John C. Donnelly, Detroit, Mich., for petitioner; David M. Hayes, William V. Kokko, Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., on brief.

Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C., for respondent; Peter G. Nash, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Harold J. Engel, Attys., N. L. R. B., Washington, D. C., on brief.

Before MILLER and KENT, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

KENT, Circuit Judge.

This is a petition for review of an order of the National Labor Relations Board [1] and a cross petition for enforcement of such order.

The Board ordered reinstatement of two employees of the petitioner with back pay. The Board reversed its Trial Examiner in reaching the conclusion that the employees were entitled to reinstatement. There is little dispute about the facts.

Petitioner's plant in Battle Creek, Michigan, employs approximately 3,500 people. The majority of the hourly rated employees are members of Local No. 3, American Federation of Grain Millers, AFL–CIO, (herein referred to as the Millers). The remainder of the employees (approximately 150) are represented by Printing Specialty and Paper Products Union Local No. 480, International Printing Pressmen and Assistants' Union of North America AFL–CIO. (herein referred to as the Pressmen).

During the month of April, 1969, the contracts which the Petitioner had with each of the Unions expired. The contract of the Millers expired on April 15, but the parties agreed to an extension to May 2 while negotiations continued. A new agreement was reached on April 26, 1969, which was made retroactive to April 15. The agreement between the petitioner and the Millers Local No. 3 was termed a supplemental agreement and included all of the provisions of a master agreement between the Millers International Union and the Company, negotiated in February, 1969, and designed to cover four of the Company's plants. The Pressmen were not as successful as the Millers with their negotiations with the Petitioner and went on strike on April 25, 1969. The strike was not settled until July 22, 1969. The two employees who were the subject of these proceedings refused to cross the Pressmen's picket line and after hearing, in accordance with the Millers' contract, were discharged (for nonattendance). They were not discharged for violation of the no strike clause.

Robert Sutfin, one of the employees, was the son, and Elaine Putnam was a wife, of striking members of the Pressmen. Each employee had been previously warned in regard to excess absenteeism on more than one occasion.

While the basic issues involved relate to the interpretation of the contract between the Petitioner and the Millers, there are also presented questions as to whether the employees' refusal to cross the picket line was because they were honoring the picket line or because of personal reasons, and also as to whether or not each of the employees had made an unconditional demand for reinstatement.

The Master Agreement, incorporated into the supplemental Agreement negotiated by Local No. 3 of the Millers, contained the following provisions relating to strikes and lockouts:

NO STRIKES–NO LOCKOUTS

Section 1101

(a) During the life of this Supplemental Agreement no strike or

work stoppages in connection with disputes arising hereunder shall be caused or sanctioned by the Union, or by any member thereof, and no lockout shall be ordered by the Company in connection with such disputes.

(b) It is agreed that any authorized legal strike that may be called by the Union, or any lockout by the Company on or after the expiration of the Master Agreement in an effort to secure a new Master Agreement shall not be deemed a breach of the provision of this Supplemental Agreement prohibiting strikes or work stoppages and lockouts during the life of this Supplemental Agreement.

(c) It is agreed that any authorized legal strike that may be called, or any lockout by the Company, on or after the expiration of this Supplemental Agreement in an effort to secure changes in or a new agreement, shall not be deemed a breach of the provisions of the Master Agreement.

## NO SYMPATHY STRIKE

### Section 1102

During the life of this Supplemental Agreement, no sympathy strike shall be caused or sanctioned by the Union because of differences between the AFL–CIO or any of its affiliated Unions and any other local or national employers, except for differences between the AFL–CIO or any of its affiliated Unions involving other plants of the Company.

## STRIKE AUTHORIZATION

### Section 1103

It is agreed that before a strike may be called the Company will be given a copy of the written authorization which is provided to the local Union by the President of the AMERICAN FEDERATION OF GRAIN MILLERS authorizing such action to be taken in accordance with its Constitution and Bylaws.

The Petitioner has at all times taken the position that the terms of the contract, quoted above, made it a violation of the contract for the members of the Millers to honor a picket line of another Union at the Battle Creek plant.

At the out-set of the Pressmen's strike many of the members of the Millers refused to cross the Pressmen's picket line. All, except the two here involved, returned to work after the Company warned them that they were violating the Collective Bargaining Agreement by refusing to cross the picket line, and after Representatives of the Local and International of the Millers informed the members of that Union that a sympathy strike was not permitted under the newly negotiated contract. The position taken by Union officials in their interpretation of the contract was communicated to the members through statements given to the local newspapers, to the local radio stations, and by means of notices posted on Company bulletin boards asking workers to report to work and honor their contract.

The Trial Examiner took evidence relating to the advice given by Local and International officers of the Millers and based his conclusion in part upon such evidence. The Board in reversing the Trial Examiner took a different view of this evidence, extraneous to the contract, and reached a different conclusion, as pointed out above.

The Court of Appeals for the District of Columbia in News Union of Baltimore v. N.L.R.B., 129 U.S.App.D.C. 272, 393 F.2d 673 (1968), concluded that the position taken by Union officials that the no strike provisions of the contract covered sympathy strikes was strong evidence that the clause was intended to bar such strikes; and in N.L.R.B. v. Rockaway News Co., 345 U.S. 71, 73 S. Ct. 519, 97 L.Ed. 832 (1953), the United States Supreme Court approved the consideration of extrinsic evidence as an

aid in determining the coverage intended by a broad no strike agreement. However, this Circuit in weighing the effect of the attitude of Union officers in regard to refusal to cross another Union's picket line stated in N.L.R.B. v. Difco Laboratories, Inc., 427 F.2d 170, 172 (6th Cir., 1970):

> "Finally, whether the UAW did or did not want the two discharged employees to strike obviously has no bearing on their right to do so if they considered such action to be in their own best interest."

Thus, we conclude that if the Millers' contract did not prohibit the sympathetic honoring of another Union's picket line then Putnam and Sutfin were engaging in protected concerted activity (as will be pointed out hereafter), and if the contract did prohibit such activity then they were properly discharged. We, therefore, conclude that after removing the factual issues we are faced with one fundamental problem: The interpretation of the Millers' contract no strike clauses.

The right to strike is guaranteed by the National Labor Relations Act, 29 U.S.C. § 151 et seq., as interpreted in numerous cases. The United States Supreme Court in N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, stated at page 233, 83 S.Ct. 1139, at page 1148, 10 L.Ed.2d 308 (1963).

> "Section 7 guarantees, and § 8(a) (1) protects from employer interference the rights of employees to engage in concerted activities, which, as Congress has indicated, H.R.Rep. No. 245, 80th Cong., 1st Sess. 26, include the right to strike."

See also Division 1287, Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Missouri, 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963). Any doubt as to the right to strike is removed by the Act itself. 29 U.S.C. § 163.[2]

▮▮▮ The right of employee members of one Union to engage in concerted activities in support of the members of another Union has been reviewed by this Court in N.L.R.B. v. Difco Laboratories, Inc., 427 F.2d 170 (6th Cir., 1970), where at page 171 we said:

> "[2] Nonetheless, respondent contends that under the circumstances of this case, it had a right as an employer to require these two employees, who were not members of the union which struck and picketed at respondent's plant, to cross the picket line on pain of discharge for failure to do so. This court has previously dealt with essentially the same contention in NLRB v. City Yellow Cab Co., 344 F.2d 575 (6th Cir. 1965), wherein we said:

> "The cabdrivers testified that they went on strike and engaged in picketing because they were in sympathy with the demand of the switchboard operators for recognition. The Act protects the rights of employees 'to engage in * * * concerted activities for the purpose of * * * mutual aid or protection' 29 U.S.C. § 157. N.L.R.B. v. Halsey W. Taylor Company, 342 F.2d 406 (C.A. 6, March 3, 1965).

> "As said by Judge Learned Hand in N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503, 505 (C.A. 2):

> " 'Certainly nothing elsewhere in the act limits the scope of the language to "activities" designed to benefit other "employees"; and its rationale forbids such a limitation. When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they en-

---

2. "§ 163. Right to strike preserved
   Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right. July 5, 1935, c. 372, § 13, 49 Stat. 457: June 23, 1947, c. 120, Title I, § 101, 61 Stat. 151."

gage in a "concerted activity" for "mutual aid or protection," although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is "mutual aid" in the most literal sense, as nobody doubts.'

See also N. L. R. B. v. Greensboro Coca Cola Bottling Co., 180 F.2d 840 (C.A. 4); N. L. R. B. v. Schwartz, 146 F.2d 773 (C.A. 5)."

This, however, does not mean that an employee may refuse to cross another Union's picket line for personal reasons. N. L. R. B. v. Union Carbide Corporation, 440 F.2d 54, 56 (4th Cir., 1971):

"One who refuses to cross a picket line by reason of physical fear does not act on principle. He makes no common cause, and contributes nothing to mutual aid or protection in the collective bargaining process. We hold, therefore, that Mullins' refusal to cross the picket line was not protected activity under Section 7, and enforcement of the Board's order as to him will be denied."

We reiterate that the right to strike is protected by law, whether it be for economic reasons, *for the purpose of improving working conditions*, or for mutual aid or protection of employees who are members of another Union. This right may be surrendered or waived by appropriate provisions in the collective bargaining agreement. Mastro Plastics Corporation v. N. L. R. B., 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956):

"On the premise of fair representation, collective-bargaining contracts frequently have included certain waivers of the employees' right to strike and of the employers' right to lockout to enforce their respective economic demands during the term of those contracts. *Provided the selection of the*

*bargaining representative remains free,* such waivers contribute to the normal flow of commerce and to the maintenance of regular production schedules. Individuals violating such clauses appropriately lose their status as employees."

and the right to engage in a sympathy strike or the right to refuse to cross a picket line may be waived in the same manner. N. L. R. B. v. Rockaway News Co., 345 U.S. 71, 80, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953):

"In the section by which the Labor Management Relations Act prescribes certain practices of labor organizations which shall be deemed unfair, there is a proviso that nothing therein "shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act . . . ." This clearly enables contracting parties to embody in their contract a provision against requiring an employee to cross a picket line if they so agree. And nothing in the Act prevents their agreeing upon contrary provisions if they consider them appropriate to the particular kind of business involved. An employee's breach of such an agreement may be made grounds for his discharge without violating § 7 of the Act. National Labor Relations Board v. Sands Co., 306 U.S. 332, 334, 59 S.Ct. 508, 83 L.Ed. 682."

and if there is such a waiver of the right to honor another Union's picket line all members of the bargaining unit are bound by the terms of the contract. As stated by this Court in Plasti-Line, Incorporated v. N. L. R. B., 278 F.2d 482, 486 (6th Cir., 1960):

"[1, 2] The Act is based upon the principle of promoting industrial peace through collective bargaining and an orderly settlement of disputes. The law imposes on the employer the

positive duty to bargain with the representative of the majority of his employees and not to bargain with any other. Therefore, a minority group must acquiesce in the decisions and actions of such representative."

The basic question is the interpretation of the contract between the Millers and the Petitioner. It has been recognized that a collective bargaining agreement is not an ordinary contract. Transportation-Communication Employees Union v. U. P. R. Co., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966). Such an agreement is not necessarily interpreted according to the general laws relating to the interpretation of contracts. As Mr. Justice Brennan stated in a concurring opinion in United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 570, 80 S.Ct. 1343, 1364, 4 L.Ed.2d 1403 (1960):

> "Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion."

As previously stated the use of extrinsic evidence as an aid in interpreting a collective bargaining agreement has been approved in News Union of Baltimore v. N. L. R. B., 129 U.S.App.D.C. 272, 393 F.2d 673, 678 (1968).

We quote with approval from certain District Court decisions relating to the interpretation of collective bargaining agreements. As was stated in Refinery Employees' Union v. Continental Oil Company, 160 F.Supp. 723, 730–731 (W. D.La.1958):

> "[5–12] The accepted common law principles to be applied in the interpretation of agreements applicable here are these: (1) Courts give legal effects to contracts as written. However general be the terms in which a contract is couched, it extends only to those things concerning which it appears that the parties intended to con-

tract. The intent is to be determined by the words of the contract when they are clear and explicit and lead to no absurd consequences. It is the common intent that is to be sought, for if there is a difference of intent there is no common consent and no agreement. (2) When there is doubt as to the meaning of certain words, they may be explained by referring to other words and phrases used therein. (3) All clauses of an agreement are interpreted the one by the other, giving to each the sense that results from the entire Act. (4) Courts cannot make contracts for the parties, and can declare implied obligations to exist only when there is a satisfactory basis in the express provisions of the agreements which make it necessary to imply certain duties and obligations in order to effect the purposes of the parties. Before an obligation will be implied it must appear from the contract itself that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to give effect to and effectuate the purpose of the contract as a whole."

To the same effect is Industrial Trades Union v. Woonsocket Dyeing Co., 122 F. Supp. 872, 875 (D.R.I.1954):

> "[1] In Pawtucket Mach. & Supply Corp. v. Monroe, 1947, 73 R.I. 162, at page 164, 54 A.2d 399, 400, the rule to be followed in determining the construction to be given to the foregoing provisions is well set forth in the following language:

> 'The cardinal rule in the construction of a written instrument is to read its language in connection with the relative position and general purpose of the parties and to gather from it, if one can, their intent as to the particular matter in dispute. In other words, in construing a written instrument the object sought is to ascertain and give effect, in so far as the rules of law will permit, to the intention of the

parties. Sullivan v. Rhode Island Hospital Trust Co., 56 R.I. 253 [185 A. 148]; Co-operative Building Bank v. Hawkins, 30 R.I. 171, 181 [73 A. 617]; Tillinghast v. Fry, 1 R.I. 53, 57. The intention sought is only that expressed in the instrument and not some undisclosed intention that the parties may have had in mind.'

"Collective bargaining agreements like other contracts are to be given a reasonable construction, not one which results in injustice and absurdity. Weaver v. United States, 8 Cir., 1954, 210 F.2d 815."

This Court has held that the relinquishment of a right to strike must be expressed in "clear and unmistakable language." In Timken Roller Bearing Co. v. N. L. R. B., 325 F.2d 746 (6th Cir., 1963), this Court said at page 751:

"Even so, we recognize that the Union could have relinquished this right under the provisions of the bargaining agreement if it, as a part of the bargaining process, elected to do so. But such a relinquishment must be in 'clear and unmistakable' language. Tide Water Associated Oil Company, 85 N.L.R.B. 1096; N. L. R. B. v. Item Company, supra, 220 F.2d 956, 958–959, C.A. 5th, cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746, rehearing denied, 350 U.S. 905, 76 S.Ct. 177, 100 L.Ed. 795. Silence in the bargaining agreement on such an issue does not meet this test. This Court said in N. L. R. B. v. J. H. Allison & Co., supra, 165 F.2d 766, 768, 3 A.L.R.2d 990, C.A. 6th, cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369, 'Nor do we see logical justification in the view that in entering into a collective bargaining agreement for a new year, *even though the contract was silent* upon a controverted matter, the union should be held to have waived *any rights secured under the Act,* including its right to have a say-so as to so-called merit increases.' (Emphasis added.) We are of the opinion that the execution of the 1960

bargaining agreement, which was silent on this controversial question did not constitute a relinquishment of the Union's statutory right to the wage information which it now seeks. N. L. R. B. v. Hekman Furniture Co., supra, 207 F.2d 561, C.A. 6th; N. L. R. B. v. Otis Elevator Co., supra, 208 F. 2d 176, 179, C.A. 2nd; N. L. R. B. v. Yawman & Erbe Mfg. Co., supra, 187 F.2d 947, 949, C.A. 2nd."

and in a different context the Supreme Court said in Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 283, 76 S.Ct. 349, 358, 100 L.Ed. 309 (1956):

"To adopt petitioners' all-inclusive interpretation of the clause is quite a different matter. That interpretation would eliminate, for the whole year, the employees' right to strike, even if petitioners, by coercion, ousted the employees' lawful bargaining representative and, by threats of discharge, caused the employees to sign membership cards in a new union. Whatever may be said of the legality of such a waiver *when explicitly stated,* there is no adequate basis for implying its existence without a more compelling expression of it than appears in § 5 of this contract. (emphasis supplied)"

The language of the Court of Appeals for the District of Columbia seems appropriate as a description of the conclusions reached by the Trial Examiner. That Court said in International U, U. M. W. of A. v. N. L. R. B., 103 U.S. App.D.C. 207, 257 F.2d 211, 217–218 (1958):

"We sense in the Board's treatment of the problem a preference for an interpretation which results in a 'no strike' agreement, if the writing is susceptible of such an interpretation. In International Brotherhood of Teamsters Chauffeurs, Warehousemen etc. v. W. L. Mead, Inc., 1 Cir., 230 F. 2d 576, and United Construction Workers v. Haislip Baking Co., 4 Cir., 223 F.2d 872, there are expressions which support the Board's preference. Such a preference is, however, no justification for, by the process of benev-

olent interpretation, making a contract for the parties which, to a moral certainty, they did not make for themselves. Further, as to the problem of interpretation, section 13 seems to us to have a bearing. It says:

'Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.'

This section forbids a free interpretation of the Act itself in such a way as to find in it implicit inhibitions of the right to strike."

■ In this contract Section 1101, *supra* prohibits strikes or work stoppages because of disputes arising under the contract, and prohibits any strike "caused or sanctioned by the Union, or by *any member thereof,* * * *."* Section 1102 provides:

"NO SYMPATHY STRIKE

Section 1102

During the life of this Supplemental Agreement, no sympathy strike shall be caused or sanctioned by the Union because of differences between the AFL–CIO or any of its affiliated Unions and any other local or national employers, except for differences between the AFL–CIO or any of its affiliated Unions involving other plants of the Company."

By its terms the contract prohibits *any member of the* Union from striking because of a dispute under the contract. The sympathy strike clause relates only to sympathy strikes caused or sanctioned by the Union and makes no reference to the right of the members to refrain from crossing a picket line.

We find nothing in the language of this contract which prohibits a member of the Millers Union at the Battle Creek Plant from honoring the picket line of another Union at the same plant. If only the broad no strike clause of Section 1101 were considered perhaps the

extrinsic evidence offered would be sufficient to justify the conclusion reached by the Trial Examiner, but in the light of the decision of this Court in Timken Roller Bearing v. N. L. R. B., 325 F.2d 746 (6th Cir., 1963), we find no need for extrinsic evidence. We, therefore, conclude that the employees in question were engaged in protected concerted activity within the meaning of Section 7 and Section 8(a) (1) of the Act.

■ The claims of the petitioner that the employees in question refused to cross the picket line for personal reasons and that they failed to make an unconditional demand for reinstatement are clearly issues of fact which were resolved against the petitioner by the Board. These conclusions are supported by substantial evidence on the record as a whole and may not, therefore, be reviewed by this Court. 29 U.S.C. § 160(e). N. L. R. B. v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir., 1970); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951).

■ Finally, there is a claim by the Petitioner that Putnam and Sutfin had been replaced. Clearly an employer who has replaced striking workers in order to keep his plant functioning is not required to discharge the workers he employed as replacements once the strike is over. N. L. R. B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 345–346, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938):

"Nor was it an unfair labor practice to replace the striking employes with others in an effort to carry on the business. Although § 13 provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers upon the election of the latter to resume their employment, in

order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

However, the record is clear that no one was employed to replace either Putnam or Sutfin. As we read the record no one was ever assigned or hired to fill the position of Putnam. Sutfin's position was filled by another employee who was simply moved into Sutkin's position. There is no evidence in this record that anyone was hired to fill the position of the individual who was promoted to Sutfin's work. The Petitioner relies upon N. L. R. B. v. Union Carbide Corporation, 440 F.2d 54 (4th Cir., 1971). But in *Union Carbide* the Court held that workers who had honored the picket line of another union were entitled to the same status as economic strikers including the right to reinstatement if replacement had not been hired. This record reflects no new hiring and, therefore, the reason for the rule i. e. to protect the workers hired to replace the strikers does not exist because there is no one to protect.

The orders of the Board will be enforced.