IRVIN H. WHITEHOUSE & SONS
CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–2591.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1981.

Decided Sept. 28, 1981.

Laurence J. Zielke, Louisville, Ky., for petitioner.

Karen Ward, Elliott Moore, Attys., N.L.R.B., Washington, D.C., for respondent.

Before PELL, Circuit Judge, MARKEY, Chief Judge,* and WOOD, Circuit Judge.

PELL, Circuit Judge.

This case is before the court on the petition of Irvin H. Whitehouse & Sons Co. (Whitehouse) to review and set aside a final order of the NLRB (the Board) issued against Whitehouse on September 20, 1980. The Board has cross-applied for enforcement. The Board's decision and order, reported at 252 N.L.R.B. No. 140 (1980), found that Whitehouse had violated § 8(a)(1) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(1), by the discriminatory discharge of and refusal to rehire two employees, and ordered make-whole pay and the posting of appropriate notices. The issue presented by the case is whether the arbitration provision of the parties' collective bargaining agreement was sufficient to create an implied no-strike obligation as to safety disputes.

## I.

Whitehouse is a union-shop painting contractor located in Louisville, Kentucky. Its local collective bargaining agreement requires it to enter into and abide by local collective bargaining agreements wherever it performs work. From May to December 1977, Whitehouse was engaged as a subcontractor performing work in El Paso, Illinois. Pursuant to its local collective bargaining agreement Whitehouse entered a Memorandum of Understanding with Painters' Local Union No. 157 which had jurisdiction over the El Paso site.

### A. *The Collective Bargaining Agreement.*

The collective bargaining agreement gives the authority to "adjust disputes and grievances that may arise," and "to interpret this agreement so as to give force and effect to the intent, purpose and meaning of this agreement," to a Joint Local Trade Board (the Trade Board). The contract provides that disputes and grievances shall

---

* Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

be referred for resolution first to the Trade Board, and ultimately, should the Trade Board fail to agree, through several steps to final and binding arbitration by a third party. The contract provides for enforcement of the decisions of the Trade Board and arbitrator by assessment of liquidated damages, penalties prescribed by the agreement for particular violations, or, in case of violation by a contractor, by designation of that contractor as an "unfair contractor." The contract also contains an "Occupational Safety Clause," which provides that the parties "will cooperate in the prevention of accidents and in protection and promotion of the safety and health of employees." This clause does not specify penalties for its violation, although other clauses specify fines or prescribe specific corrective action for their violation.

## B. The Refusal to Work.

Between May and July 1977, Whitehouse employee Delmar Cook made several safety complaints to Whitehouse's Project Director at the El Paso site, Harold Arnold. Some of these complaints were acted upon and corrected; for example, after Cook complained that ladders did not have rubber shoes to prevent slipping, lifts were brought in to replace the ladders. Cook also complained about the lack of protective gloves after employee Albert Davidson suffered chemical burns on his hands from paint thinner. Arnold originally refused to provide gloves, but when Cook threatened to contact the Union Business Agent, Arnold relented and provided the gloves. Arnold did not remedy the other conditions complained of, which related to fire hazards in the trailer which Whitehouse maintained at the site for use as an office, storage area, and changing and cleanup room for the painters.[1]

On July 19, Arnold passed out timecards to the employees for them to check the number of hours worked the previous week. Cook noted that he had been credited for only two hours for the day on which he drove Davidson to the hospital for burn treatment. Cook contended that he should have been paid for four hours. Arnold disagreed. Cook refused to sign his timecard. Cook called the Union Business Agent to complain that evening. The Business Agent in turn called Arnold, who remained adamant. Shortly after Arnold informed Cook of this conversation at the site the next day, July 20, Cook told his fellow employees he was ill, and left the job site without informing Arnold.

Before Cook reported for work the next day he filed an OSHA complaint against Whitehouse, based on the uncorrected violations he had previously complained of to Arnold. When Cook reported for work that day, Arnold chastised him for failing to report to him before leaving the previous day. Cook reiterated his complaints about working conditions.

Cook then asserted that he would not work in the unsafe conditions. Davidson agreed with Cook, and the two employees changed from their painting clothes back into their street clothes. Arnold warned them that he would not take them back if they walked off the job, but the employees left the job site. They attempted to return the next day, and on three subsequent occasions, but were refused admittance. Whitehouse subsequently replaced them with two other union painters.

## C. Post-Refusal Proceedings.

An OSHRC inspector visited the job site the day after Cook and Davidson walked off the job, and cited Whitehouse for the violations alleged in Cook's complaint, but did not impose a fine. After Whitehouse refused to reinstate the two employees, the Union filed charges with the Trade Board alleging that Whitehouse had refused to correct safety violations at the site, and had violated the contract by failing to accept Cook and Davidson for further employment. The Trade Board imposed a $250 fine for each violation, but did not order affirmative relief.

1. Cook's other complaints specified the lack of a no-smoking sign in the trailer, open cans of thinner and paint, lack of fire extinguishers, and dangerous proximity of welding to naphtha drums stored just outside the trailer.

## D. *The NLRB Proceedings.*

An Administrative Law Judge (ALJ) found that Whitehouse had violated § 8(a)(1) of the Act by discharging and refusing to reinstate Cook and Davidson for engaging in protected concerted activity, specifically, a walkout to protest Whitehouse's failure to correct unsafe working conditions.[2] The Board affirmed in a two to one decision, holding that the parties did not intend the contract's arbitration provision to extend to the Occupational Safety Clause, and that implication of a no-strike clause which would render the walkout unprotected was improper. In ascertaining the intent of the parties the Board relied primarily upon the perceived inadequacy of the contract's remedial provisions as to safety violations, and the parties' reliance upon OSHRC to settle safety disputes as evidence that they relied upon extra-contractual means of seeking safety-related remedies. Member Penello dissented, noting that the contract provided for enforcement of its provisions in a final and binding manner, and therefore met the Supreme Court's test for implying a no-strike obligation.

Whitehouse contends the Board erred in concluding that the arbitration provision did not extend to safety disputes and therefore did not create an implied no-strike obligation. It urges that the contract provisions give rise as a matter of law to an implied no-strike obligation, and that any strike or walkout in violation of that obligation was unprotected, and that the employees could therefore be lawfully discharged for breaching that obligation.

## II.

■ Determination of whether the arbitration provision of a collective bargaining contract extends to safety disputes, and thus gives rise to a no-strike obligation as to those disputes, requires construction of the contract under accepted principles of traditional contract law, and in light of the basic policy of national labor legislation favoring the arbitral process as a substitute for economic warfare. *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105, 82 S.Ct. 571, 577–78, 7 L.Ed.2d 593 (1962). In *Lucas Flour* and in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Supreme Court established the principles governing the existence and scope of implied agreements not to strike.

■ We note preliminarily that although interpreting a written instrument is a matter of law in which we are not obliged to follow the interpretation of the Board, *see, e. g., Celanese Corp. v. NLRB*, 291 F.2d 224, 226 (7th Cir. 1961), *cert. denied*, 368 U.S. 925, we generally exercise our usual deference to the Board's expertise in this regard. *Moore v. Sunbeam Corp.*, 459 F.2d 811, 817 & n.10 (7th Cir. 1972). Such deference is limited in this situation, however, and extends only insofar as the Board interpretation is supported by the language of the agreement and relevant and necessary extrinsic evidence. *W–I Canteen Service, Inc. v. NLRB*, 606 F.2d 738, 747 (7th Cir. 1979).

■ The first requisite for implication of a no-strike obligation is that the contract impose upon both parties the duty of submitting to final and binding arbitration. *Lucas Flour*, 369 U.S. at 105, 82 S.Ct. at 577–78; *Gateway Coal*, 414 U.S. at 374–75, 94 S.Ct. at 635. As noted above, this collective bargaining agreement required referral of both parties' grievances and disputes to the Trade Board for resolution, and ultimately to an arbitrator if the Trade Board could not agree. The contract is explicit as to the effect given to the arbitration decision: "When a decision is reached either by the ... Trade Board, by the conciliator or by the arbitrator, such decision shall be final and binding upon all parties." This agreement thus satisfies the first element of the *Lucas Flour-Gateway Coal* test.

---

2. The ALJ also found a violation of § 8(a)(3) of the Act. The Board reversed, finding no anti-union animus.

The second element required for inference of a no-strike obligation as to a particular matter is that the matter be one which it has been agreed will be covered by the compulsory terminal arbitration. *Lucas Flour*, 369 U.S. at 106, 82 S.Ct. at 578. The *Gateway Coal* decision addressed itself to this question in precisely the context posed by the instant suit, *i. e.*, whether a dispute over safety was governed by an arbitration provision. The Court first noted the broad language of the arbitration clause, which reached "any local trouble of any kind aris[ing] at the mine." 414 U.S. at 376, 94 S.Ct. at 636. The Court held, "On its face, this contractual language admits of only one interpretation: that the agreement required the union to submit this dispute to arbitration for resolution by an impartial umpire." *Id.* The Court then rejected the reasoning of the Court of Appeals, which had enforced the Board's order on the basis of a putative public policy disfavoring arbitration of safety disputes. On the contrary, the Court held, the presumption of arbitrability first enunciated in the *Steelworkers*[3] trilogy applies to safety disputes in the same manner as it does to other areas of potential management-labor dispute. The presumption of arbitrability over such disputes is so strong, the Court went on to hold, that in the absence of any express provision excluding a particular grievance from arbitration, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." 414 U.S. at 376 n.10, 94 S.Ct. at 636 n.10. We find this reasoning applicable and controlling in the present case.

■ While the agreement at issue here did not contain the "any local trouble" phrase construed in *Gateway Coal*, it did grant the Trade Board the broad power to adjust disputes and grievances that might arise between the parties, and to interpret the contract so as to give effect to its purposes. As noted above, this contract explicitly provides for the protection of promotion of the safety and health of employees. The specific inclusion of such aims as one of the purposes of the contract is perhaps more compelling evidence of the parties' intent to arbitrate such disputes than is the sweeping, but more general language of *Gateway Coal*. Construing the contract as a whole and in light of the presumption of arbitrability, *see Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *W–I Canteen*, 606 F.2d at 745, we find the contract unambiguously and on its face includes safety disputes within the scope of the arbitration provisions. Nor is there the type of express exclusion from arbitrability the *Gateway Coal* Court held would be required to negate such an inference. We hold therefore that the arbitration provision of the collective bargaining agreement does extend to disputes over safety, and that the Board erred by ruling to the contrary. We are unpersuaded by the Board's reasoning to the contrary.

The Board held that the presumption of arbitrability was rebutted by the fact that the health and safety clause was silent on the amount of liquidated damages to be levied for its violation, and failed to provide any affirmative remedial alternative to imposition of a fine. The Board reasoned that since the agreement's remedial provisions were not explicitly linked to the safety clause, there was "doubt as to the parties' intentions with respect to arbitration of safety grievances."[4] Slip Op. at 4. We believe the analysis of dissenting Member Penello is the more appropriate expression of the law as enunciated by the Supreme Court:

---

**3.** *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**4.** Some clauses of the contract explicitly link themselves to the arbitration procedure, while the Occupational Safety Clause does not. Whatever tenuous negative implication might be gleaned from this omission does not rise to the level of the express negation required by *Gateway Coal*, 414 U.S. at 380 n.10, 94 S.Ct. at 638 n.10.

My colleagues in the majority conclude that the contractual provision limiting remedies for violations of the agreement to fines or liquidated damages constitutes inadequate consideration upon which to predicate an implied no-strike agreement under the Supreme Court's decision in *Lucas Flour*. They would adopt the [ALJ's] finding that there was no *quid pro quo* present from which a no-strike agreement could be implied under *Gateway Coal*. Therefore, in the absence of a no-strike agreement rendering the walk-out unprotected, the majority finds that Respondent violated Section 8(a)(1) of the Act by discharging Cook and Davidson for engaging in a protected strike over unsafe working conditions. I disagree. There is nothing in either *Lucas Flour* or *Gateway Coal* to support the majority's conclusion that the Supreme Court would consider the adequacy of the remedies in the arbitration clause of the contract to have any bearing upon whether a no-strike obligation would be implied, and the majority has cited no cases in support of this novel proposition.

. . . .

I see no reason to create an additional criterion for determining whether the parties intended that a no-strike agreement be implied when there is no support for this proposition in either case law or national labor policy. The Supreme Court expressed no concern in *Lucas Flour* or *Gateway Coal* as to the actual mechanics of the system by which the parties elected to enforce their agreement, so long as the system ultimately resolved disputes in a final and binding way. This is in accord with the strong national policy favoring the arbitration of labor disputes as a substitute for industrial strife.

Slip Op. at 10, 13–14. (Footnotes omitted.) We further note that the Court was explicit in *Gateway Coal* that "[d]oubts should be resolved in favor of coverage," 414 U.S. at 380 n.10, 94 S.Ct. at 638 n.10 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). We believe the collective bargaining agreement, read as a whole, reflects on its face a desire to insure labor peace and avoid resort to economic weapons by submitting disputes over issues within its confines to final and binding arbitration.

We hold, therefore, that the contract, read as a whole and in light of the presumption of arbitrability, unambiguously provides for arbitration of safety disputes. In light of the traditional contract principle, *see Lucas Flour*, 369 U.S. at 105, 82 S.Ct. at 577–78, that extrinsic evidence of the intent of parties to a contract need only be considered when the provisions of the contract itself are ambiguous, we need not reach the question whether the Board erred in its weighing of such matters. We do note, however, that as Member Penello points out in dissent, the Board's finding of reliance on extra-contractual resolution of safety disputes is contradicted by the behavior of the parties in this suit, for the Union did submit its safety grievance to the Trade Board for resolution. Any inference to the contrary of the arbitrability of safety disputes is highly speculative and unsupportable in light of the well-settled presumption of arbitrability.

### III.

■ Once a determination is made that a dispute is subject to arbitration, the obligation not to strike over that matter is considered to be coterminous. *Gateway Coal*, 414 U.S. at 382, 94 S.Ct. at 639. Coterminous interpretation means that if the subject of a work stoppage is covered by the arbitration provisions of the contract, then the stoppage violates the no-strike clause. *Delaware Coca-Cola Bottling Co. v. General Teamster Local Union 326*, 624 F.2d 1182, 1185–86 (3d Cir. 1980). The walkout by Cook and Davidson thus violated the contractually-imposed obligation not to strike over safety matters, but rather to submit them to the arbitration process. *Gateway Coal*, 414 U.S. at 380–87, 94 S.Ct. at 638–41; *see Delaware Coca-Cola Bottling* at 1185–86.

■ A work stoppage carried out in violation of a no-strike clause is not protected activity under the Labor Act, and may

**836**

give rise to discharge, *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 246, 82 S.Ct. 1318, 1323–24, 8 L.Ed.2d 462 (1962); *Moore v. Sunbeam Corp.*, 459 F.2d 811, 816 (7th Cir. 1972); *Artim Transportation System, Inc. v. NLRB*, 396 F.2d 359, 365 (7th Cir. 1968), regardless of whether the no-strike obligation is expressed in the contract or implied from the duty to arbitrate, *Inland Steel Co. v. Local Union No. 1545. United Mine Workers*, 505 F.2d 293, 299 (7th Cir. 1977), overruled in part on other grounds, *Zeigler Coal Co. v. Local Union No. 1870, United Mine Workers*, 566 F.2d 582 (7th Cir. 1977), cert. denied, 436 U.S. 912, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Because Cook and Davidson walked out in violation of the implied obligation not to strike over safety disputes, Whitehouse did not violate § 8(a)(1) of the Act by discharging and refusing to rehire them.

The Board asserts that employee protests over safety are always protected activity, relying on *NLRB v. Washington Aluminum*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (employees refused to work in 11 degree weather; no no-strike obligation); *Brown & Root, Inc. v. NLRB*, 634 F.2d 816 (5th Cir. 1981) (employees wished to wait for rain to stop before working with electrical equipment); *Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009 (3d Cir. 1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981) (employees refused to operate crane after observing unsafe condition; collective bargaining agreement provided for such temporary cessation); *NLRB v. Modern Carpet Industries, Inc.*, 611 F.2d 811 (10th Cir. 1979) (employees refused to handle radioactive lead; no no-strike obligation); *NLRB v. Leslie Metal Arts Co.*, 509 F.2d 811 (6th Cir. 1975) (employees walked out when threatened by another employee; no no-strike obligation); *Union Boiler Co. [v.]*, 213 N.L.R.B. 818, enforced, 530 F.2d 970 (4th Cir. 1975) (no no-strike obligation). These cases are all distinguishable from the instant situation in that they are either situations in which a safety hazard suddenly arose and presented an immediate threat, or in which no arbitration provision existed for resolution of safety disputes and the parties were required to fall

back upon their economic weapons. The instant case does not present a situation where employees temporarily ceased work until a novel and immediately threatening situation was corrected, but rather one in which employees chose to protest the existence of conditions which had apparently existed from day one of the job by withholding their services completely. This was a method of protest they had given up in return for binding arbitration. We find that *Gateway Coal* is virtually indistinguishable from this case, and thus regardless of whether a temporary work stoppage is ever justified by sudden and immediate danger to employees, that the walkout in this situation was unprotected.

For the foregoing reasons we grant the petition to review and set aside the order of the NLRB, and deny the Board's cross-application for enforcement.

REVIEW GRANTED; ENFORCEMENT DENIED.