NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MARYLAND SHIPBUILDING AND DRYDOCK COMPANY, Respondent.

No. 81–2207.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1982.

Decided July 21, 1982.

Richard Michael Fischl, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Lynn E. Deitch, Washington, D. C., on brief), for petitioner.

Gil A. Abramson, Baltimore, Md. (Kathleen Pontone, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for respondent.

Before RUSSELL, WIDENER and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The National Labor Relations Board applies for enforcement of an order issued against respondent Maryland Shipbuilding and Drydock Company as a result of the allegedly discriminatory suspension of its employee, Leon Miller. We conclude that the activity for which Miller was allegedly suspended was not protected, and deny enforcement.

I.

Maryland Shipbuilding is engaged in the construction and repair of ocean-going vessels. Leon Miller has worked for the Company as a painter since 1971, and for the past several years he has served as the shop steward for Local No. 31 of the Industrial Union of Marine and Shipbuilding Workers of America, on the midnight to 8:00 a. m. shift. On March 25, 1980, he reported to work at midnight, and crew leader Norman Benjamin assigned him and four other painters to perform "needlegunning"[1] in "foam tanks" on the U.S.S. Raleigh, a ship then being serviced.

Foam tanks are cylindrical tanks, about ten feet long, and three and one half to four feet deep, and three feet wide, which are used for firefighting. They are entered through a central covered hole. There were four foam tanks on the Raleigh, two located about eighty feet apart on the forward side of the ship's quarterdeck, and two similarly located about one hundred feet away, on the aft side of the quarterdeck.

At about 12:20 a. m., Miller and the other painters boarded the ship and waited for Benjamin to assign them to specific tanks. Twenty minutes later, Benjamin arrived and assigned Miller to the forward port tank, Albertus Martin, another painter, to the aft port tank, and the remaining three painters to the forward starboard tank.[2]

Miller protested that the assignment of a single employee to a foam tank during the midnight shift violated Article XIX of the collective bargaining agreement, which provides:

---

1. Needlegunning is a process whereby paint is removed from surfaces with a pneumatic blank hammer prior to the application of fresh paint. It requires an individual to work inside the tanks, and is very awkward and unpleasant.

2. Other workers had started the needlegunning during the previous shift, and had worked without complaining. However, since there were more employees working during the earlier shift, the tanks had been less isolated than during the midnight shift.

Employees will not be required to work alone in remote or isolated spaces such as double bottoms, forepeak tanks, copper dams and cargo tanks of tankers.... An employee will not be considered as working alone when there is another employee assigned to work with him who is working on the tank top.

Benjamin told Miller to take his complaint to General Foreman Don Huey in the morning, and left without making any changes.

Miller asked a passing employee to have the Union Safety Committeeman, Howard Sprouse, contact him. When Sprouse arrived, Miller emerged from his tank and asked Sprouse to terminate the job because of the alleged safety violation. Sprouse replied that he had no authority to stop the work, and suggested that they contact the Plant Security Officer, Lieutenant Bryan Smith. Miller then telephoned Smith and told him of the problem.

Smith and Company Fireman Leo Egan arrived shortly before 2:00 a. m., and the two men met with Miller and Sprouse. Miller explained that he believed the work assignments did not comply with Article XIX of the collective bargaining agreement. After paging Benjamin, Miller, along with Smith and Sprouse, inspected the other foam tanks. They found that only two of the three painters assigned to the forward starboard tank were working there, and that there was one man in each of the other two rear tanks. One of them knocked on the tank where Albertus Martin was working alone.[3] Martin emerged and was present during the ensuing conversation.

Benjamin and Production Supervisor Charles Cox arrived five minutes later. Cox argued that the foam tanks were not within the scope of Article XIX, but Sprouse disagreed, pointing out that in light of the small number of people working during the midnight shift, the area surrounding the tanks was isolated. Smith

suggested that Benjamin circulate around the foam tanks every fifteen minutes so that there would be someone near the tanks at all times. With Smith's approval, Benjamin decided instead to assign Reginald Holden, a painter who had arrived at work late, to stand watch outside Miller's tank. He also assigned two other painters to stand outside the aft tanks.

Miller resumed working, and needle-gunned for the balance of his shift. At the end of the shift, Smith and Benjamin submitted written reports of the incident to Raymond Neall, the Assistant Foreman for the paint and labor department. Later that day Neall and Jones examined the tank on which Miller had been working, and noted that approximately half of the needlegunning work had been completed. Neall also reviewed Miller's personnel file, and discovered two prior warnings—one for failing to wear safety glasses, and one for leaving work early. No disciplinary action had been taken on either occasion. Neall decided to suspend Miller for three days and prepared a written notice charging him with failure to carry out his job assignment, wasting time during working hours and interfering with his supervisor's carrying out his assigned job.

Miller filed, but later withdrew, written grievances protesting both the alleged safety violation and what he considered to be management's harassment of him for complaining about the matter. He then filed charges with the Board, and after an administrative hearing the ALJ found that the Company had violated section 8(a)(1) of the Act by issuing a disciplinary notice to and suspending Leon Miller because he had engaged in a protected concerted activity. The Board adopted the ALJ's findings and her order directing the company to make Miller whole for losses suffered due to the suspension, to expunge the suspension notice from his records, and to post an appropriate notice.[4]

3. There was conflicting evidence with respect to which of the men knocked on Martin's tank, and the administrative law judge found only that "one of the group knocked." The Board

does not now contend that it was Miller who knocked on the tank.
4. The Board declined to adopt the ALJ's finding that Miller's construction of the contract was

The Board now applies for enforcement of its order. In response, the Company argues that Miller's conduct was unprotected because it violated the collective bargaining agreement, that he was not engaged in concerted activity, and that in any event Miller was suspended because of his poor performance. We agree with the Company that Miller's conduct was in violation of the contractual prohibition of suspensions of work, and therefore, under *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), was unprotected.

## II.

The first step in the inquiry is to examine the contractual language in order to determine the scope of the Union's and its members' obligation not to suspend work. Since the collective bargaining agreement is clear, and the Board does not argue that the dispute was beyond the scope of the obligation, we address the question briefly.

The pertinent contractual language provides:

> During the life of this Agreement there shall be no lockouts on the part of the Company nor suspension of work on the part of the employees.
>
> . . . .
>
> This agreement is a guaranty that there shall be neither strikes nor lockouts during the term hereof.

Thus, by its terms, the contract forbids all suspensions of work, irrespective of their duration or purpose.

■ The scope of the obligation is, of course, coterminous with the scope of the agreement to arbitrate, unless the contract clearly provides otherwise. *See, e.g., Gateway Coal, supra*, 414 U.S. at 382, 94 S.Ct. at 639; *Irvin H. Whitehouse & Sons v. NLRB*, 659 F.2d 830, 835 (7th Cir. 1981).[5] The contract's arbitration provision, like its no-strike clause, is extremely broad. The contract states without qualification that "[c]omplaints, disputes, or grievances shall be handled in the following manner," and establishes a three step procedure for resolution of the grievances.[6] If the Union is dissatisfied with the outcome of that procedure, it may notify the manager of Industrial Relations that it is taking the grievance to arbitration. "Decisions of the Arbitrator shall be final and binding upon the Company and the Union." Thus any grievance can be appealed to arbitration.

■ The collective bargaining agreement is unambiguous. Miller was entitled to file a grievance with respect to the work assignments and press it to arbitration, and any suspension of work in lieu of arbitration was in violation of the contract.

## III.

The remaining question is whether Miller's pursuit of his grievance during his

---

correct, noting that under its view the merits of the contractual dispute had no bearing on the protected nature of the activity. *See, e.g., NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 206 (7th Cir. 1971) (per curiam); *NLRB v. John Langenbacher*, 398 F.2d 459, 462 63 (2d Cir. 1968), *cert. denied*, 393 U.S. 1049, 89 S.Ct. 685, 21 L.Ed.2d 691 (1969). We express no view on that question.

5. The scope of the obligation to arbitrate is of particular importance when there is no express no-strike clause, as in *Gateway Coal. See also Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Under those circumstances, the only way to determine the scope of the implied no-strike obligation is by reference to the arbitration provisions. Here, where there is an express no-strike clause, we look to the arbitration pro-

vision only to determine whether the no-strike clause was intended to apply as broadly as its language suggests.

6. The grievance is first submitted by the aggrieved employee to the foreman of his department, who is required to resolve the matter within forty-eight hours. The Union can then appeal the foreman's decision to company representatives, chosen from the Production and Industrial Relations Department, who meet regularly to consider grievances. Finally, the Union is entitled to appeal that decision to the Manager of Industrial Relations or Production, or their representatives. In addition, the contract provides:

> The Company agrees that it will, within reasonable limitations of subject matter, give prompt verbal answers to informal grievances.

shift violated his obligation not to suspend his work. The Board argues that Miller "merely temporarily halted his work in an effort to resolve a dispute peacefully through resort to established complaint procedures." Petitioner's brief at 17 n.15. Our review of the record persuades us that, whatever its label, Miller's conduct violated the contract.

▋ Miller received a work assignment which he believed violated the collective bargaining agreement. He was entitled to pursue his grievance informally before turning to the formal grievance and arbitration procedure authorized by the contract. However, after his foreman rejected his complaint and, according to Miller's own testimony, instructed him to see the foreman in the morning, as the contract required,[7] Miller continued to pursue his complaint, first by having Union Safety Committeeman Sprouse summoned, and then by calling Plant Security Officer Smith. The ensuing conversations lasted about a half hour, and during that time Miller stopped working to make the argument already rejected by the foreman, and to show the other tanks to the men. Miller subsequently filed a written grievance, but then withdrew the grievance. Thus, Miller suspended his work to pursue a grievance which was subject to arbitration, in violation of the collective bargaining agreement.[8]

We emphasize that Miller had attempted to pursue his complaint informally, and had been instructed by Benjamin to see the general foreman in the morning. It was not the attempted informal resolution which violated the contract, but the ensuing suspension of work. The existence of a formal grievance and arbitration procedure does not bar an employee from pursuing a complaint informally after working hours, or with his employer's acquiescence. It is, of course, in the interest of the employer, the employee and the union to resolve grievances efficaciously. Here, however, the foreman rejected Miller's contention, and directed him to continue working and to pursue the grievance through contractual procedures after working hours. Miller's continued pursuit of the matter while he was supposed to be working is, under those circumstances, a suspension of work in violation of the contract.

## IV.

▋ A contractually prohibited work stoppage is not protected activity, unless undertaken "because of abnormally dangerous conditions for work at the place of employment...." 29 U.S.C. § 143. *See Gateway Coal, supra,* 414 U.S. at 385–87, 94 S.Ct. at 640–41. Here the Board does not contend that the assignment of one employee to work in a foam tank is "abnormally dangerous." Since we have concluded that Miller engaged in a work stoppage in violation of the collective bargaining agreement, his conduct was unprotected.[9] Accordingly, we deny enforcement.

## ENFORCEMENT DENIED.

7. As a Union steward, Miller was undoubtedly familiar with the grievance procedure established by the collective bargaining agreement. Indeed, he was sufficiently well versed in the terms of the contract to cite the language of Article XIX during the discussion of the work assignments. In any event, had he been unfamiliar with the proper procedure, Benjamin's instruction that he see the foreman in the morning apprised him of the proper course of action.

8. As the Board concedes, a work stoppage can take a form other than that of a traditional strike. For instance, a refusal to work overtime may violate a no-strike clause, although the offending employees continue to work regular hours. *Avco Corp. v. Local Union # 787 of International Union, United Automobile,*

*Aerospace and Agricultural Implement Workers,* 459 F.2d 968, 974 (3d Cir. 1972); *NLRB v. Leprino Cheese Co.,* 424 F.2d 184, 186 (10th Cir. 1970), *cert. denied,* 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970). Repeated refusals to perform a job, although of brief duration, also constitute unprotected work stoppages. *Excavation-Construction, Inc. v. NLRB,* 660 F.2d 1015, 1021 (4th Cir. 1981). Thus the fact that Miller suspended his work for only a half hour does not establish that no suspension of work took place. On the contrary, it establishes that suspension of work did occur.

9. In light of our conclusion that Miller's conduct was unprotected, we need not decide whether his activity was concerted, or whether there was substantial evidence to support the

Board's conclusion that he was suspended for pursuing the grievance.