727 F.2d 594
 115 L.R.R.M. (BNA) 2912, 100 Lab.Cas. P 10,819
 RYDER TRUCK LINES, INC., Plaintiff-Appellee,
v.
TEAMSTERS FREIGHT LOCAL UNION NO. 480; Luther Watson;
Frank Hopkins; Turner Brim; Clyde Powers; and its Agents,
Servants, Members and Employees and all Persons Acting in
Concert with it and Employees of Ryder Truck Lines, Inc.,
Who Act in Concert with Said Named Defendants, Defendants-Appellants.
 No. 81-5127.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 10, 1983.
Decided Feb. 13, 1984.
 
 Cecil Branstetter (argued), Jan Jennings, Nashville, Tenn., for defendants-appellants.
 Robert H. Cowan (argued), Michael Miller, Malcolm McCune, Gracy, Maddin, Cowan & Bird, Nashville, Tenn., for plaintiff-appellee.
 Before LIVELY, Chief Judge, EDWARDS, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE, KRUPANSKY, and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.
 
 
 1
 JOHN W. PECK, Senior Circuit Judge, delivering the opinion of the Court.
 
 
 2
 A panel of this court vacated a district court's judgment that awarded damages to an employer, Ryder Truck Lines (Ryder), under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, for injuries arising from an alleged violation by Teamsters Freight Local Union No. 480 (Local 480) of the no-strike provisions of a collective bargaining agreement. 705 F.2d 851 (6th Cir.1983). Although the panel upheld the district court's resolution of various damages issues, it held that the district court's failure to make a factual determination of the reason for the strike was reversible error because the agreement, properly construed, prohibited strikes only over arbitrable disputes. Ryder filed a petition for rehearing, Fed.R.App.P. 40, and a suggestion for rehearing en banc, Fed.R.App.P. 35. This court granted the petition for rehearing and directed that the case be reheard en banc. 710 F.2d 233 (6th Cir.1983). The effect of this action was "to vacate the previous opinion and judgment of this Court ... and to restore the case on the docket as a pending appeal." 6th Cir. R. 14. The parties have submitted supplemental briefs and this court has heard additional oral argument. We now affirm the judgment of the district court.
 
 I. Background
 A. The Collective Bargaining Agreement
 
 3
 Ryder and Local 480 were signatories to a national collective bargaining agreement, the National Master Freight Agreement, and a supplemental agreement, the Southern Conference Area Over-the-Road Supplemental Agreement.[1] Each agreement contains a broadly worded no-strike provision. Article 44 of the supplemental agreement provides in relevant part:
 
 
 4
 The Unions and the employers agree that there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement as provided for in this Agreement and in the National Agreement, if applicable, of any controversy which might arise.
 
 
 5
 Article 8, Sec. 2(a) of the national agreement provides in relevant part:
 
 
 6
 The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, except as specifically provided in other Articles of the National Master Freight Agreement, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement except:
 
 
 7
 (1) failure to comply with a duly adopted majority decision of a grievance committee established by the National Master Freight Agreement or Supplmental [sic] Agreement;
 
 
 8
 (2) a National Grievance Committee deadlock of a grievance rendered pursuant to the procedures provided herein; and
 
 
 9
 (3) failure to make health and welfare and pension payments in the manner required by the applicable Supplemental Agreement.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 The Local Union shall give the Employer a twenty-four (24) hour prior written notice of the Local Union's authorization of strike action which notice shall specify the majority grievance committee decision or deadlocked National Grievance Committee decision providing the basis for such authorization. The Local Union shall comply with the provisions of the applicable Supplemental Agreement relating to strike action resulting from delinquencies in the payment of health and welfare or pension contributions.
 
 
 13
 In addition to the three exceptions to the no-strike provisions listed in article 8, Sec. 2(a), articles 9,[2] 27,[3] and 28[4] of the national agreement outline explicit exceptions to the no-strike provisions in situations involving matters not covered by the grievance procedures adopted by the parties.
 
 
 14
 Finally, article 8 of the national agreement and articles 43 and 44 of the supplemental agreement outline grievance procedures. The broad character of the grievance procedure is reflected by the fact that approximately thirty six hundred grievances are docketed against Ryder under the grievance procedures per year.
 
 B. The Dispute
 
 15
 This dispute, termed a "molehill" by the district court, concerned who was responsible for the cleaning of windshields. Pursuant to a local agreement applicable to Ryder's St. Louis, Missouri terminal, Ryder employed one person, called a "fuel man", to service trucks and to wash windshields. There was no formal policy or procedure regarding the washing of windshields when the fuel man was not on duty. Prior to May 1, 1977, Ryder supervisory personnel on occasion had left the terminal office to wash windshields when the fuel man was not on duty. Either on May 1, 1977 or shortly thereafter, Ryder's new St. Louis terminal manager instituted a policy that supervisory personnel refrain from washing windshields and that drivers be required to wash their own windshields when the fuel man was not on duty. There was no evidence that this policy had been breached prior to May 16, 1977.
 
 
 16
 On May 16, 1977, two Nashville, Tennessee based Ryder drivers, Willie Thomas and Jerry Boyd, were awaiting assignment at St. Louis. Both drivers were members of Local 480. Ryder's St. Louis dispatcher called the drivers and advised them to come to the St. Louis terminal within the normal two-hour period to accept their assignments. After the drivers arrived at the terminal, they clocked in and conducted a "walk-around inspection" of their units. The drivers informed the dispatcher that the windshields were dirty and requested that they be cleaned.[5]
 
 
 17
 The dispatcher, after consulting a superior, advised the drivers that the fuel man was not on duty, that the company would not wash the windshields, and that, consequently, the drivers would have to wash their own windshields. The drivers telephoned their Nashville business agent, Frank Hopkins, who consulted Local 480 president, Luther Watson. After the conversation, the drivers refused to wash their windshields or to proceed until they were cleaned. The dispatcher, after again consulting his superior, informed the drivers that unless they proceeded as directed, they would be considered to have quit their jobs voluntarily. When the drivers adhered to their position, the dispatcher informed them that they had voluntarily quit and that they should leave the premises. The drivers refused to leave.
 
 
 18
 At this point, Ryder called police to remove the drivers from the premises. The police unsuccessfully requested the drivers to leave. The police also informed the dispatcher that they could remove the drivers only if a warrant for trespassing was issued. The dispatcher agreed to sign a warrant for trespassing. After the drivers again telephoned Hopkins, they announced that Ryder could fire them but that they would not leave the premises voluntarily because they had not quit their jobs. The drivers were arrested and escorted to jail. They were incarcerated for approximately six hours.
 
 
 19
 At 6:00 p.m. that day, Local 480 established a picket line at Ryder's Nashville terminal and instituted a work stoppage. Local 480 obtained the release of the drivers from jail and they returned to Nashville on the morning of May 17, 1977. Upon their return, the drivers went first to the union hall and then to Ryder's terminal. According to Thomas, when the drivers arrived at the terminal at approximately 1:00 p.m. the strike was still in progress. Following an ex parte hearing, the United States District Court for the Middle District of Tennessee issued a temporary restraining order enjoining the strike. The clerk entered this order at approximately 1:30 p.m. The strike ended at approximately 2:00 p.m., less than twenty-four hours after it began.
 
 
 20
 Pursuant to the collective bargaining agreement, the drivers filed grievances alleging that they had been wrongly discharged by Ryder. The decision of the grievance committee held for the drivers and provided for their reinstatement with back pay and for the compensation of their travel expenses from St. Louis to Nashville.
 
 
 21
 Ryder filed a grievance asserting that the strike was illegal. The National Grievance Committee deadlocked on this issue. Following the deadlock, Ryder initiated this action by filing an amended complaint seeking damages under Sec. 301 of the Labor Management Relations Act. On January 12, 1981, a bench trial was held. The trial court held that Local 480 had violated the terms of the collective bargaining agreement because: (1) the strike it had instituted was not authorized by any of the exceptions to the no-strike provisions and (2) it had not furnished Ryder the twenty-four hour prior written notice of the strike required by article 8, Sec. 2(a) of the national agreement. The trial court entered judgment in favor of Ryder and awarded compensatory damages of $26,238.50. Local 480 appeals.
 
 II. Analysis
 
 22
 On appeal, Local 480's principal argument is that the strike did not violate the collective bargaining agreement because the arrests of the drivers were not arbitrable under the agreement and, therefore, any strike in protest of those arrests was not subject to the contractual no-strike provisions. Because the trial court did not make an explicit determination of the reason for the strike, Local 480 contends that a remand is necessary. There is, however, no need to remand for a specific finding of the cause of the strike, for we reject the legal premise offered by Local 480 that would make such an inquiry relevant in this case.
 
 
 23
 Local 480 offers as a settled legal rule applicable to this case the proposition that a no-strike clause waives the option of striking in response to a dispute only if the dispute is subject to the contractually provided grievance and arbitration procedures. We do not read the legal precedents as broadly.
 
 
 24
 The doctrine of coterminous interpretation of arbitration and no-strike clauses arose in the context of contracts containing an arbitration clause but lacking an explicit no-strike obligation. In Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Supreme Court, affirming an award of damages arising from an illegal strike, held that even in the absence of an explicit no-strike clause, an arbitration clause creates an implied prohibition of strikes over matters subject to that clause. The Court stated that such an implied no-strike obligation was necessary "to promote the arbitral process as a substitute for economic warfare." Id. at 105, 82 S.Ct. at 578.
 
 
 25
 The doctrine of coterminous interpretation has also been applied in the context of the narrow exception to the anti-injunction provision of Sec. 4(a) of the Norris-LaGuardia Act, 29 U.S.C. Sec. 104,[6] that was enunciated in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In Boys Markets, the Court held that a district court's injunction of a strike would not violate the Norris-LaGuardia Act if the court had held that the strike concerns a grievance which the parties are contractually bound to arbitrate and the court had ordered the employer to submit to arbitration. The rationale underlying Boys Markets was the implementation of the congressional preference for resolution of disputes by means of the contractually provided dispute settlement mechanisms.
 
 
 26
 In Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court applied the doctrine of coterminous interpretation as expressed in Lucas Flour and held that an arbitration clause gave rise to an implied no-strike obligation which permitted the issuance of an injunction against a strike based on the principles enunciated in Boys Markets. As in Lucas Flour, the Court reasoned that a no-strike obligation coterminous in application to the agreement to arbitrate is implied by the arbitration clause absent an explicit indication of an intention to the contrary. Id. at 382, 94 S.Ct. at 639. The Court reasoned that the federal policy justifying the Boys Markets exception to the anti-injunction provisions of the Norris-LaGuardia Act where the collective bargaining agreement contains an express no-strike clause was equally valid where the no-strike obligation was implicit in the arbitration clause. Id. at 381-82, 94 S.Ct. at 638-639. The Court recognized, however, that although "an arbitration agreement is usually linked with a concurrent no-strike obligation ... the two issues remain analytically distinct." Id. at 382, 94 S.Ct. at 639.
 
 
 27
 In Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Court held that even where there is an express no-strike clause that might be violated by a strike, the Boys Markets exception to the anti-injunction provisions of Sec. 4(a) of the Norris-LaGuardia Act does not permit the enjoining of a strike unless the underlying dispute is arbitrable under the collective bargaining agreement. The Court reasoned that when a strike is called over a nonarbitrable dispute, an injunction cannot be justified because the strike does not threaten or frustrate the arbitration process by breaching or evading the union's promise to submit dispute grievances to arbitration. Id. at 407-12, 96 S.Ct. at 3147-3149, 3150. Even though in Buffalo Forge the Supreme Court held that the extent to which an explicit no-strike clause is enforceable by injunction under Boys Markets is coterminous with the scope of the arbitration clause contained in the collective bargaining agreement, the Court recognized that strikes not subject to injunction may still violate the explicit no-strike clause and that other remedies, such as damages, may be available. Id. at 410-11, 96 S.Ct. at 3149. See International Union United Automobile, Aerospace & Agriculture Implement Workers v. Lester Engineering Co., 718 F.2d 818, 822 (6th Cir.1983).
 
 
 28
 That the doctrine of coterminous interpretation in the context of Boys Markets and Buffalo Forge applies only to determining the permissibility of enjoining strikes and not to determining the scope of an explicit no-strike clause was further clarified in Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982). In Jacksonville Bulk Terminals the Court held that a strike called to protest the invasion of Afghanistan by the Soviet Union was not enjoinable under the Boys Markets exception to the Norris-LaGuardia Act's anti-injunction prohibition because the underlying dispute was plainly not arbitrable under the collective bargaining agreement. Id. at 721-22, 102 S.Ct. at 2685-2686. Nevertheless, the Court stated that the issue of whether the strike violated the explicit no-strike clause contained in the collective bargaining agreement was a separate question from whether the strike was enjoinable. Id. at 721-22, 102 S.Ct. at 2685-2686. The Court's holding is wholly inconsistent with Local 480's contention that under the doctrine of coterminous interpretation an express no-strike clause does not prohibit a strike over a nonarbitrable dispute. The Court's holding does illustrate, however, that where there is an express no-strike clause, strikes are enjoinable only if over an arbitrable matter.
 
 
 29
 The instant case does not implicate either of the contexts in which the doctrine of coterminous interpretation traditionally has been employed. Unlike Lucas Flour and Gateway Coal, the no-strike obligation is expressed in the collective bargaining agreement rather than implicit in contractually provided grievance and arbitration procedures. Unlike Boys Markets and its progeny, this case does not involve the issue of whether a federal court could have enjoined the continuation of the strike without running afoul of the anti-injunction provisions of Sec. 4(a) of the Norris-LaGuardia Act. Because the simple question that confronts us is whether the express no-strike clauses contained in the national and supplemental agreements were violated by Local 480's strike, the doctrine of coterminous interpretation is inapplicable to this case. United States Steel Corp. v. N.L.R.B., 711 F.2d 772, 777 (7th Cir.1983); Inland Steel Corp. v. N.L.R.B., 718 F.2d 1104 (7th Cir.1983) (mem.).
 
 
 30
 The cases cited by Local 480 do not dictate a contrary conclusion. As Local 480 notes, language in Delaware Coca-Cola Bottling Co. v. General Teamster Local 326, 624 F.2d 1182 (3d Cir.1980), does suggest that the doctrine of coterminous interpretation is applicable to the construction of any express no-strike clause. The Third Circuit, however, has declined to construe Delaware Coca-Cola as broadly as Local 480 urges. In Pacemaker Yacht Co. v. N.L.R.B., 663 F.2d 455 (3d Cir.1981), the court stated that "[t]he principle of coterminous interpretation, however, is not a rule of law, but merely a tool of contract interpretation ... which 'must be applied to the facts of each case.' " Id. at 457-58 (citations omitted). The Pacemaker Yacht court declined to apply the doctrine of coterminous interpretation based upon its reading of the contract as establishing a waiver of the right to strike that extends beyond the scope of the arbitration clause. Id. at 458-59.
 
 
 31
 In N.L.R.B. v. Gould, Inc., 638 F.2d 159 (10th Cir.1980), cert. denied sub nom. Brown Boveri Electric Co. v. N.L.R.B., 452 U.S. 930, 101 S.Ct. 3065, 69 L.Ed.2d 430 (1981), the court, after recognizing that it may be reasonable in some cases to infer that the parties intended an arbitration clause and an express no-strike clause in a collective bargaining agreement to be coterminous in scope, held that the particular no-strike clause at issue was so linked to the grievance-arbitration machinery provided in the agreement that the two clauses should be construed as having coterminous application. See also N.L.R.B. v. C.K. Smith & Co., 569 F.2d 162 (1st Cir.1977), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978); Gary Hobart Water Corp. v. N.L.R.B., 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). Where the no-strike clause is independent from the arbitration and grievance procedure provisions, however, no principle of contract interpretation requires limitation of the scope of the no-strike clause to matters covered by the contractually provided arbitration and grievances procedures. United States Steel, supra, 711 F.2d at 777-78 Cf. Gould, supra, 638 F.2d at 164 & n.4 (extrinsic evidence permissible to show an intent that no-strike clause not limited to arbitrable disputes).
 
 
 32
 The question remains whether the strike in this case was prohibited by the general no-strike clauses contained in the national and supplemental agreements. We start from the proposition that employees may through the collective bargaining process waive various rights, including the right to strike. Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); N.L.R.B. v. Rockaway News Co., 345 U.S. 71, 80, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953). Such a waiver, however, must be clear and unmistakable. Kellogg Co. v. N.L.R.B., 457 F.2d 519, 525 (6th Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). We conclude from our review of the bargaining agreement that Local 480's waiver of its right to strike in this case was clear and unmistakable.
 
 
 33
 As an initial point, neither the language of the no-strike clauses nor any other contractual language limits the prohibition of strikes to strikes over arbitrable disputes. Montana-Dakota Utilities Co. v. N.L.R.B., 455 F.2d 1088, 1093-94 (8th Cir.1972); United States Steel, supra, 711 F.2d at 778. Additionally, the express language of the no-strike clause in article 8, Sec. 2(a) of the national agreement not only prohibits strikes by Local 480 except in specific circumstances, but also prohibits lockouts by Ryder except in the same specified circumstances. Construing a similar clause as prohibiting strikes over nonarbitrable, as well as arbitrable, disputes, the court in Pacemaker Yacht, supra, 663 F.2d at 458-59, held that "[i]t is apparent that the no-strike pledge ... was given in exchange for the Company's no-lockout pledge" rather than in exchange for a grievance and arbitration procedure. We think it no less apparent that the no-strike pledge here was given in exchange for the no-lockout pledge.
 
 
 34
 In reaching our conclusion that the no-strike pledge contained in the collective bargaining agreement was not limited to strikes over arbitrable disputes, we do not contend that the general no-strike clauses, read in isolation, suffice to waive the right to strike, regardless of the nature of the underlying dispute. Mastro Plastics, supra, 350 U.S. at 281, 76 S.Ct. at 357; W-I Canteen Service, Inc. v. N.L.R.B., 606 F.2d 738, 745 (7th Cir.1979). Rather, we recognize that the no-strike clauses must be read in the light of the contract as a whole and in the light of the law relating to the contract when it was made. Mastro Plastics, supra, 350 U.S. at 279, 76 S.Ct. at 356; W-I Canteen Service, supra, 606 F.2d at 745; Kellogg Co., supra, 457 F.2d at 524-25.
 
 
 35
 Read in the light of the contract as a whole, the no-strike clauses clearly apply to disputes over nonarbitrable, as well as arbitrable, matters. Articles 9 and 28 provide, respectively, that sympathy strikes to honor a primary picket line are permissible and that action taken in sympathy with affiliated unions does not violate the terms of the collective bargaining agreement. Article 27 permits a signatory union to resort to any lawful economic resource, including strikes, in support of its request for contract revisions in the event that the agreement is opened for renegotiation prior to the agreement's expiration. On their face, these articles permit Local 480 to engage in strikes over matters not subject to the dispute settlement mechanisms contained in the agreement. If, as Local 480 contends, the no-strike clauses prohibit strikes only over disputes subject to the dispute settlement mechanisms contained in the agreement, these articles would be superfluous. Although collective bargaining agreements are not necessarily to be interpreted according to the general principles of contract construction, e.g., Kellogg Co., supra, 457 F.2d at 524, even in the context of a labor contract, language must be interpreted so that it is not rendered meaningless. Id. at 524-25; Pacemaker Yacht, supra, 663 F.2d at 459; Retail Clerks International Association Local No. 455 v. N.L.R.B., 510 F.2d 802, 805-06 & n. 15 (D.C.Cir.1975). To give effect to the language of articles 9, 27, and 28, the no-strike clauses must be interpreted as prohibiting strikes not falling within one of the expressly provided exceptions, regardless of whether the underlying dispute is arbitrable. Pacemaker Yacht, supra, 663 F.2d at 459; W-I Canteen Service, supra, 606 F.2d at 745.
 
 
 36
 Read in the light of the applicable law, the no-strike clauses need not be construed narrowly to prohibit strikes only over arbitrable disputes. As the court in United States Steel, supra, recognized, a broad construction of a no-strike clause may in appropriate circumstances support the federal policy of furthering collective bargaining as a means of preventing the interruption of work. 711 F.2d at 780. Indeed, to hold that no-strike clauses must be construed as prohibiting only strikes over arbitrable issues would undermine the fundamental premise of freedom of contract on which federal labor policy is based by undercutting management's ability to obtain "an across-the-board no-strike clause and labor's ability to gain concessions in return for such a pledge." Pacemaker Yacht, supra, 663 F.2d at 460.
 
 
 37
 Because we conclude that the parties intended to prohibit strikes not falling within one of the expressly provided exceptions in the collective bargaining agreement regardless of whether the underlying dispute is arbitrable, and because such a conclusion is consistent with federal labor policy, we concur in the district court's holding that Local 480's strike violated the no-strike provisions of the collective bargaining agreement.
 
 III. Conclusion
 
 38
 As stated above, the panel upheld the district court's handling of the issue of damages. 705 F.2d at 858. We adopt the panel's analysis on this issue.
 
 
 39
 In sum, we affirm the judgment of the district court.
 
 
 40
 KEITH, Circuit Judge, with whom Circuit Judges GEORGE CLIFTON EDWARDS, Jr. and NATHANIEL R. JONES join, dissenting.
 
 
 41
 I respectfully disagree with the majority's holding in this case. The general no-strike clauses contained in the national and supplemental agreements did not prohibit the strike by Ryder's employees. In my view, the majority has misperceived the issue that must first be addressed by the Court.
 
 
 42
 Ryder argued and the district court concluded that the express language of the no-strike clause precluded judicial interpretation and unambiguously prohibited all strikes. By addressing the issue in this manner, the majority completely misses the mark. A contractual prohibition against work stoppage does not invalidate the right to conduct a work stoppage to protest matters which cannot be resolved under contractual grievance procedures. A work stoppage precipitated by a non-arbitrable dispute would not come within the purview of the contract and would not constitute a breach of the no-strike clause. Therefore, the question that must be addressed is whether the nature of the work stoppage was covered by the contract. The district court's failure to address this threshold question and its failure to make corresponding findings of fact constituted reversible error. My distinguished brethren of the majority have erred, in my view, in deciding to the contrary.
 
 I.
 
 43
 The majority recognizes that the right to strike or engage in work stoppages, guaranteed by Section 7 of the National Labor Relations Act, 24 U.S.C. Sec. 157, may be surrendered or waived by an express provision in the collective bargaining agreement. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956).
 
 
 44
 Certain statutory rights such as the right to strike "are conferred on employees collectively to foster the process of bargaining and properly may be exercised or relinquished by the union as a collective bargaining agent to obtain certain economic benefits for union members." Alexander v. Gardner-Denver Co., 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). The majority goes astray in failing to recognize that the promise not to strike, is the quid pro quo for the employer's promise to submit grievances to arbitration. Boys Markets v. Retail Clerks, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970). This quid pro quo theory is the basis for the concept of coterminous interpretation. That is, the right to strike may be bargained away in exchange for an employer's promise to bestow certain benefits such as terminal arbitration. Coterminous interpretation refers to the notion that if the subject matter of the strike is arbitrable, then the strike violates the no-strike clause. Delaware Coca-Cola v. General Teamsters Local Union, 624 F.2d 1182, 1185 (3d Cir.1980). Correlatively, the obligation to refrain from striking is not violated when the subject of the strike is non-arbitrable. Id.
 
 
 45
 The district court erred by not applying the coterminous interpretation theory to determine whether the strike violated the no-strike clause in the parties' agreement. This theory is supported by a wealth of case law. See Teamsters Local 174 v. Lucas Flour, 369 U.S. 95, 106, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962) ("a no-strike clause agreement [will not be] implied beyond the area which it has been agreed will be exclusively covered by compulsory terminal arbitration"); Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974) ("[a]bsent an explicit expression of an intention to the contrary, ... the agreement to arbitrate and the duty not to strike should be construed as having coterminous application"); Buffalo Forge v. United States Steelworkers, 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976) ("the quid pro quo for the employer's promise to arbitrate was the union's obligation not to strike over issues that were subject to the arbitration machinery"). See also, Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc., 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982); Delaware Coca-Cola, supra; NLRB v. Southern California Edison Co., 646 F.2d 1352 (9th Cir.1981); Irvin H. Whitehouse & Sons v. NLRB, 659 F.2d 830 (7th Cir.1981).
 
 
 46
 The majority's attempt to distinguish these cases on grounds that they involved either implied no-strike clauses or were actions in which the parties were seeking injunctive relief is overly simplistic. The Third Circuit in Delaware Coca-Cola v. General Teamsters Local Union, 624 F.2d 1182 (3d Cir.1980) recognized that "[r]elevant Supreme Court precedent, as shown by both Buffalo Forge and Mastro Plastics, supports the conclusion that a broadly worded no-strike clause does not waive the right to strike over non-arbitrable matters that are not covered by the strikers' contract." 624 F.2d at 1187. Subsequent Third Circuit decisions have not retreated from this position. Pacemaker Yacht Co. v. NLRB, 663 F.2d 455 (3d Cir.1981), a case which the majority inexplicably points to as digressing from the holding in Delaware Coca-Cola, goes no further than to state that "the principle of coterminous interpretation, is not a rule of law but merely a tool of contract interpretation ... which must be applied to the facts of each case." Id. at 457-58. I wholeheartedly agree. Indeed, it is the district court's failure to apply this interpretative tool to the facts of this case that mandates our dissent.
 
 
 47
 The vast weight of authority indicates that an express waiver of the right to strike cannot be read in a vacuum. A no-strike provision must be interpreted in light of the concomitant duty to arbitrate. It would be inimical to fundamental principles of labor relations to prohibit strikes in protest of matters which cannot be resolved through arbitration.
 
 II.
 
 48
 Coterminous interpretation of the agreement between the parties would have led to a correct resolution of this case. If the windshield dispute was the cause of the work stoppage, the strike was clearly illegal since the responsibility for cleaning windshields is a matter governed by the contract and subject to arbitration. However, if the work stoppage was caused by the arrest of union men, the strike was not illegal since the arrest of employees is a matter which does not concern the contractual relationship and cannot be resolved through grievance procedures.
 
 
 49
 Evidence presented before the district court indicated that the cause of the work stoppage was the arrest and jailing of union members. James Barton, Ryder Area Transportation Manager, testified that union representatives informed him "if we did not get them out of jail that they were going to strike on us." Barton also testified that union representatives stated "the police in St. Louis caused it [the strike]." This testimony was buttressed by the introduction of the following telegram the Union sent to Ryder: "Reason for stoppage was the company jailed two of its black employees, members of this organization, for no reason." A factual determination of the reason for the strike was critical to a finding of liability. The district court's failure to make such an inquiry constituted reversible error.
 
 Conclusion
 
 50
 The majority has missed the mark in my opinion, by failing to remand this case to the district court for clarification of the reasons for the strike. Their decision sets a dangerous precedent which, if followed, will work a grave injustice against union members. A rule of law that subsumes all the union's rights under a general no-strike provision can only promote unequal bargaining power and encourage labor instability. It is for these reasons that I respectfully dissent.
 
 
 
 [1]
 The national and supplemental agreements collectively are referred to as the "collective bargaining agreement."
 
 
 [2]
 Article 9 provides in relevant part:
 ARTICLE 9 Protection of Rights
 Section 1. Picket Lines
 It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's place of business.
 Section 2. Struck Goods
 It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action if any employee refuses to perform any service which his Employer undertakes to perform as an ally of an Employer or person whose employees are on strike, and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.
 
 
 [3]
 Article 27 provides:
 ARTICLE 27 Emergency Reopening
 In the event of war, declaration of emergency or imposition of economic controls during the life of this Agreement, either party may re-open the same upon sixty (60) days written notice and request renegotiation of matters dealing with wages and hours. There shall be no limitation of time for such written notice. Upon the failure of the parties to agree in such negotiations within sixty (60) days thereafter either party shall be permitted all lawful economic recourse to support its request for revisions. If Governmental approval of revisions should become necessary, all parties will cooperate to the utmost to attain such approval. The parties agree that the notice provided herein shall be accepted by all parties as compliance with the notice requirement of applicable law, so as to permit economic action at the expiration thereof.
 
 
 [4]
 Article 28 provides:
 ARTICLE 28 Sympathetic Action
 In the event of a labor dispute between any Employer, party to this Agreement, and any International Brotherhood of Teamsters' Union, parties to this or any other International Brotherhood of Teamsters' Agreement, during the course of which dispute such Union engages in lawful economic activities which are not in violation of this or such other Agreement, then any other affiliate of the International Brotherhood of Teamsters, having an Agreement with such Employer shall have the right to engage in lawful economic activity against such Employer in support of the above first-mentioned Union notwithstanding anything to the contrary in this Agreement or the International Brotherhood of Teamsters' Agreement between such employer and such other affiliate.
 
 
 [5]
 There was no evidence as to whether the windshields were so dirty that a safety hazard existed
 
 
 [6]
 29 U.S.C. Sec. 104(a) provides:
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment.